FILED

NOV 26 2019

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 19-357 |
| v. | ) | |
| | ) | |
| RAVITEJ REDDY | ) | (18 U.S.C. § 371; |
| | ) | 42 U.S.C. § 1320a-7b(b)(2)(A)) |

## INFORMATION

The United States Attorney charges:

## GENERAL ALLEGATIONS

At all times material to this Information

### The Medicare Program

1.     The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled.     The benefits available under Medicare were governed by federal statutes and regulations.     The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.     Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3.     Medicare programs covering different types of benefits were separated into different program "parts."     For example, "Part A" of the Medicare program covered health

services provided by hospitals, skilled nursing facilities, hospices, and home-health agencies.   On the other hand, "Part B" of the Medicare Program was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

4.     Physicians, clinics, and other health care providers, including laboratories, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

5.     A Medicare claim was required to contain certain important information, including: (a) the Medicare beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI").   The claim form could be submitted in hard copy or electronically.

**Part B Coverage and Regulations**

6.     CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B.   The MACs were private entities that reviewed claims and made payments to providers for services rendered to Medicare

beneficiaries.   The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

7.   Novitas Solutions Inc. ("Novitas") was the MAC for the consolidated Medicare jurisdictions that covered Louisiana, Mississippi, Oklahoma, Texas, and Pennsylvania.

8.   To receive Medicare reimbursement, providers were required to apply to the applicable MAC and execute a written provider agreement.   The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider.   CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider.   The Medicare laws, regulations, and program instructions are available through the Medicare contractor.   I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

9.   CMS Form 855B contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

10.   Payments under Medicare Part B were often made directly to the health care provider rather than to the patient or beneficiary.   For this to occur, the beneficiary would assign the right of payment to the health care provider.   Once such an assignment took place, the health care provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

## Cancer Genomic and Pharmacogenetic Testing

11.    Cancer genomic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future.    CGx testing was not a method of diagnosing whether an individual presently had cancer.

12.    Pharmacogenetic testing ("PGx") testing detected specific genetic variations in genes that impacted the metabolism of certain medications.    In other words, PGx testing helped determine, among other things, whether certain medications would be effective if used by a particular patient.

13.    Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."    42 U.S.C. § 1395y(a)(1)(A).    Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury."    42 C.F.R. § 411.15(a)(1).    Among the statutory exceptions Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

14.    If diagnostic testing were necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing.    Specifically, Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem."    "Tests

4

not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

15.     Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, including when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer.   Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

### The Defendant and Related Independent Clinical Laboratories

16.     Defendant RAVITEJ REDDY was a resident of the Western District of Pennsylvania and the owner of Personalized Genetics, LLC, d/b/a Personalized Genomics ("PGL"), an independent clinical laboratory ("ICL") located in Pittsburgh, Pennsylvania.   On or about September 16, 2016, PGL submitted provider enrollment documentation to Medicare, including a CMS Form 855B.  Defendant RAVITEJ REDDY executed the CMS Form 855B, indicating his knowledge of, among other things, the prohibition on paying kickbacks and submitting claims for services that were not medically necessary or otherwise compensable under applicable federal law.

17.     On or about October 31, 2018, defendant RAVITEJ REDDY purchased Med Health Services Management, LP ("MHS"), an ICL located in Monroeville, Pennsylvania.   On or about December 1, 2018, Medicare documented the change in ownership of MHS with defendant RAVITEJ REDDY identified as the owner.

18.     In general, ICLs operated independently from hospitals and attending or consulting physician's offices.   ICLs typically performed services involving the biological, microbiological, serological, chemical, immunohematological, hematological, biophysical, cytological, pathological, or other examination of materials derived from the human body for the purpose of

diagnosing, preventing, or treating a disease, or for the assessment of a medical condition. Medicare required that these ICL services be ordered and used promptly by the physician who was treating the Medicare beneficiary.

19.     Prior to Medicare enrollment approval, ICLs were required to supply proof of certification under the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"). CLIA established a set of national standards for laboratories to ensure quality testing. PGL and MHS both maintained active CLIA certifications.

20.     At no time did PGL and MHS possess properly validated testing equipment necessary to run CGX tests.

### Reference Laboratories

21.     In certain limited circumstances, Medicare permitted ICLs to establish arrangements with so-called "reference laboratories." Such arrangements existed when an ICL received a specimen for testing, but instead of testing the specimen in-house, the ICL acted as a "referring laboratory" by sending the specimen to another laboratory, the "reference laboratory," to complete the testing. Pursuant to Title 42, United States Code, Section 1833(h)(5)(A), referring laboratories were permitted to bill for tests performed by a reference laboratory so long as the referring laboratory met one of the following conditions:

       a.     The referring laboratory was located in, or is part of, a rural hospital;

       b.     The referring laboratory was wholly owned by the entity performing such test, the referring laboratory wholly owned the entity performing such test, or both the referring laboratory and the entity performing such test were wholly owned by a third entity; or

       c.     The referring laboratory did not refer more than 30 percent of the clinical laboratory tests for which it received requests for testing during the given calendar year.

22.     On or about October 17, 2016, defendant RAVITEJ REDDY submitted to Medicare a document certifying that no more than thirty (30) percent of PGL's tests would be performed by a reference laboratory.   At no time relevant to this Information did defendant RAVITEJ REDDY submit a supplemental or amended certification.

### Telemedicine

23.     Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

24.     Telemedicine companies provided telemedicine services to individuals by hiring doctors and other health care providers.   Telemedicine companies typically paid doctors a fee to conduct consultations with patients.   In order to generate revenue, telemedicine companies typically either billed insurance or received payment from patients who utilized the services of the telemedicine company.

25.     Medicare Part B covered expenses for specified telehealth services but only when certain requirements were met.   These requirements included that (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was at a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth consultation with a remote practitioner.

### Relevant Individuals and Entities

26.     Person 1 was a resident of Georgia and the owner and operator of Company 1, a consulting company located in Atlanta, Georgia.   Among other things, Person 1, through Company 1, established contractual relationships with marketing entities located throughout the United States for the purpose of obtaining CGx and PGx specimens from Medicare beneficiaries

for subsequent submission to ICLs for testing.   Person 1 also established relationships with third-party billing entities that were contracted to submit CGx and PGx insurance claims, including Medicare claims, on behalf of ICLs.

27.   Person 2 was a resident of Texas, who performed purported brokering and consulting services related to, among other things, the acquisition of CGx and PGx specimens from Medicare beneficiaries.

28.   Person 3 was a resident of South Carolina and the owner and operator of Company 2, a telemedicine corporation based in Ft. Lauderdale, Florida, that purported to provide telemedicine services, including, among other things, physician authorizations for CGx and PGx testing of Medicare beneficiaries.

29.   Person 4 and Person 5 were residents of Florida and the owners and operators of Company 3, a marketing entity located in Broward County, Florida, that obtained CGx and PGx specimens from Medicare beneficiaries for subsequent submission to ICLs for testing.

30.   Person 6 was a resident of Florida and the owner and operator of Company 4, a marketing entity located in Panama City, Florida, that obtained CGx and PGx specimens from Medicare beneficiaries for subsequent submission to ICLs for testing.   From time to time, Person 6 also conducted business in the name of Company 5.

## COUNT ONE

The United States Attorney further charges that:

31.     Paragraphs 1 through 30 of this Information are re-alleged and incorporated by reference as though fully set forth herein.

### The Conspiracy and Its Objects

32.     From in and around May 2018, through on or about April 12, 2019, in the Western District of Pennsylvania, and elsewhere, the defendant, RAVITEJ REDDY, did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with Persons 1 through 6, and others known and unknown to the United States Attorney, to commit offenses against the United States, that is:

a.     to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring individuals to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare;

b.     to violate Title 42, United States Code, Section 1320a-7b(b)(1)(B), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole or in party by a Federal health care program, that is Medicare;

c.     to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A), by knowingly and willfully offering and paying any remuneration, specifically, kickbacks and bribes,

directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare; and

        d.      to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B), by knowingly and willfully offering and paying any remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole or in party by a Federal health care program, that is Medicare.

## Purpose of the Conspiracy

33.      The purpose of the conspiracy was for defendant RAVITEJ REDDY and his co-conspirators to unlawfully enrich themselves by: (a) soliciting, receiving, offering, and paying kickbacks and bribes in connection with the recruitment and referral of Medicare beneficiaries to PGL; (b) soliciting, receiving, offering, and paying kickbacks and bribes in connection with the acquisition, via telehealth referrals, of CGx- and PGx-testing prescriptions for Medicare beneficiaries; (c) submitting and causing the submission of claims to Medicare for CGx and PGx tests, the vast majority of which were performed by a PGL-contracted reference laboratory; (d) concealing the kickbacks and bribes; and (e) diverting proceeds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

## Manner and Means

34.      It was a manner and means of the conspiracy that Person 4 and Person 5 (through Company 3) and Person 6 (through Company 4), among other marketers, obtained access to

thousands of Medicare beneficiaries by targeting them with telemarketing campaigns and inducing them to submit CGx and PGx specimens by means of cheek swabs sent to the Medicare beneficiaries' homes or provided to them at purported "health fairs" held throughout the United States, among other acquisition methods.

35.     It was a further manner and means of the conspiracy that defendant RAVITEJ REDDY, Person 1, Person 2, Person 4, Person 5, and Person 6, among others, offered and paid kickbacks and bribes to Person 3 in order to obtain prescriptions for CGx and PGx tests from the telemedicine physicians contracted by Company 2, despite the fact that those doctors did not conduct a proper telemedicine visit, were not treating the Medicare beneficiaries for cancer or symptoms of cancer, did not use the test results in the treatment of the beneficiaries, and generally were not qualified to understand and interpret the test results.

36.     It was a further manner and means of the conspiracy that defendant RAVITEJ REDDY, Person 1, and Person 2 offered and paid kickbacks and bribes to Person 4, Person 5, and Person 6, among other marketers, in exchange for causing Medicare beneficiaries to submit CGx and PGx samples, as well as certain Medicare-required documents, to PGL in support of PGL's subsequent claims to Medicare.

37.     It was a further manner and means of the conspiracy that defendant RAVITEJ REDDY and PGL entered into sham agreements with Person 4, Person 5, and Person 6, among other marketers, that disguised the kickbacks and bribes as hourly or other purportedly legitimate flat-fee payments.

38.     It was a further manner and means of the conspiracy that defendant RAVITEJ REDDY and his co-conspirators took advantage of PGL's physical location within the coverage area of the Novitas MAC, which offered the highest reimbursement rates in the United States.

11

Indeed, defendant RAVITEJ REDDY and his co-conspirators used PGL as the billing ICL despite the fact that PGL did not possess properly validated equipment to conduct any CGx testing on-site and, as such, was forced to send samples to a reference laboratory located outside of the Novitas MAC coverage area. Defendant RAVITEJ REDDY and his co-conspirators regularly discussed the fact that PGL was using a reference laboratory to conduct far more than 30% of its testing, in violation of the limit established by federal law.

39.     It was a further manner and means of the conspiracy that defendant RAVITEJ REDDY and Persons 1 through 6, among others, discussed methods for maximizing Medicare reimbursements, including the size and composition of the gene panels for which to conduct CGx and PGx testing and what questions marketers should ask Medicare beneficiaries regarding their personal and familial medical histories.

40.     It was a further manner and means of the conspiracy that defendant RAVITEJ REDDY and Persons 1 through 6, among others, discussed the need to ensure that the telemedicine physicians contracted by Person 3 and Company 2 authorized CGx and PGx testing for Medicare beneficiaries at a consistently high rate (i.e, in excess of 95% of the time).

41.     It was a further manner and means of the conspiracy that defendant RAVITEJ REDDY and Persons 1 through 6, among others, regularly circulated, via email, spreadsheets that tracked Medicare claims submitted by PGL for CGx and PGx tests. Among other things, the spreadsheets identified the name of the Medicare beneficiary, the amount billed to Medicare for testing, the amount paid by Medicare, and the kickbacks owed to Person 4, Person 5, and Person 6, among others, for each Medicare beneficiary. Kickbacks documented in the spreadsheets were calculated on a percentage basis, typically between 40% and 55% of the net Medicare

reimbursement after deductions for costs associated with third-party billing services, testing by a reference laboratory, and other overhead.

42.     It was a further manner and means of the conspiracy that defendant RAVITEJ REDDY caused PGL to submit claims to Medicare under PGL's NPI number, through a third-party billing entity, for CGx and PGx testing in amounts regularly exceeding $12,000 per beneficiary.

43.     It was a further manner and means of the conspiracy that defendant RAVITEJ REDDY caused the payment of a portion of the proceeds of Medicare reimbursements to Person 1 and Person 2, with Person 1 causing the further distribution of kickback payments to Person 4, Person 5, and Person 6, among others, in the amounts determined based on each co-conspirator's pre-determined kickback percentage.

44.     It was a further manner and means of the conspiracy that Person 4 and Person 5, among other marketers, paid kickbacks to Person 3 in connection with the telemedicine physicians' authorizations for CGx and PGx testing.

45.     It was a further manner and means of the conspiracy that, as a precondition to distributing kickback payments, Person 1, often through an employee of Company 1, required Person 4, Person 5, and Person 6, among others, to execute sham attestations stating that they were not aware of any illicit kickback arrangements.

**Overt Acts**

46.     In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Western District of Pennsylvania, at least one of the following overt acts, among others:

13

a.      On or about August 8, 2018, defendant RAVITEJ REDDY caused a funds transfer in the amount of $189,953.10 from PGL's S&T Bank account #XXXXXX0443 to S&T Bank account #XXXXXX6955, which was controlled by Person 1 and associated with Company 1.

b.      On or about September 20, 2018, defendant RAVITEJ REDDY caused a funds transfer in the amount of $283,246.83 from PGL's S&T Bank account #XXXXXX0443 to S&T Bank account #XXXXXX6955, which was controlled by Person 1 and associated with Company 1.

c.      On or about September 25, 2018, defendant RAVITEJ REDDY caused a funds transfer in the amount of $493,399.67 from PGL's S&T Bank account #XXXXXX0443 to S&T Bank account #XXXXXX6955, which was controlled by Person 1 and associated with Company 1.

d.      On or about September 26, 2018, defendant RAVITEJ REDDY caused a funds transfer in the amount of $219,622.97 from PGL's S&T Bank account #XXXXXX0443 to S&T Bank account #XXXXXX6955, which was controlled by Person 1 and associated with Company 1.

e.      On or about September 27, 2018, defendant RAVITEJ REDDY caused a funds transfer in the amount of $530,049.37 from PGL's S&T Bank account #XXXXXX0443 to S&T Bank account #XXXXXX6955, which was controlled by Person 1 and associated with Company 1.

f.      On or about September 28, 2018, defendant RAVITEJ REDDY caused a funds transfer in the amount of $280,745.83 from PGL's S&T Bank account #XXXXXX0443 to

14

S&T Bank account #XXXXXX6955, which was controlled by Person 1 and associated with Company 1.

g.      On or about October 12, 2018, defendant RAVITEJ REDDY caused a funds transfer in the amount of $2,134,216.84 from PGL's S&T Bank account #XXXXXX0443 to S&T Bank account #XXXXXX6955, which was controlled by Person 1 and associated with Company 1.

h.      On or about October 24, 2018, defendant RAVITEJ REDDY caused a funds transfer in the amount of $1,021,108.59 from PGL's S&T Bank account #XXXXXX0443 to S&T Bank account #XXXXXX6955, which was controlled by Person 1 and associated with Company 1.

i.      On or about November 14, 2018, defendant RAVITEJ REDDY caused a funds transfer in the amount of $1,365,262.37 from PGL's S&T Bank account #XXXXXX0443 to S&T Bank account #XXXXXX6955, which was controlled by Person 1 and associated with Company 1.

j.      On or about December 4, 2018, defendant RAVITEJ REDDY caused a funds transfer in the amount of $1,361,344.73 from PGL's S&T Bank account #XXXXXX0443 to S&T Bank account #XXXXXX6955, which was controlled by Person 1 and associated with Company 1.

k.      On or about December 28, 2018, defendant RAVITEJ REDDY caused a funds transfer in the amount of $2,415,533.86 from PGL's S&T Bank account #XXXXXX0443 to S&T Bank account #XXXXXX6955, which was controlled by Person 1 and associated with Company 1.

l.      On or about January 18, 2019, defendant RAVITEJ REDDY caused a funds transfer in the amount of $1,127,537.30 from PGL's S&T Bank account #XXXXXX0443 to S&T Bank account #XXXXXX6955, which was controlled by Person 1 and associated with Company 1.

m.      On or about January 25, 2019, defendant RAVITEJ REDDY caused a funds transfer in the amount of $1,287,010.01 from PGL's S&T Bank account #XXXXXX0443 to S&T Bank account #XXXXXX6955, which was controlled by Person 1 and associated with Company 1.

n.      On or about February 4, 2019, defendant RAVITEJ REDDY caused a funds transfer in the amount of $1,628,525.95 from PGL's S&T Bank account #XXXXXX0443 to S&T Bank account #XXXXXX6955, which was controlled by Person 1 and associated with Company 1.

o.      On or about February 15, 2019, defendant RAVITEJ REDDY caused a funds transfer in the amount of $1,296,273.89 from PGL's S&T Bank account #XXXXXX0443 to S&T Bank account #XXXXXX6955, which was controlled by Person 1 and associated with Company 1.

p.      Between in and around May 2018 and on or about April 12, 2019, defendant RAVITEJ REDDY caused PGL to submit Medicare Part B claims for CGx and PGx testing on behalf of approximately 6,022 beneficiaries, totaling approximately $82,257,704.91, and received reimbursements of approximately $36,148,266.02, which funds were deposited into bank accounts controlled by defendant RAVITEJ REDDY and located in the Western District of Pennsylvania.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

The United States Attorney further charges that:

47. Paragraphs 1 through 30 of this Information are re-alleged and incorporated by reference as though fully set forth herein.

### The Conspiracy and Its Objects

48. From in and around October 2018, through on or about April 12, 2019, in the Western District of Pennsylvania, and elsewhere, the defendant, RAVITEJ REDDY, did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with Person 3, Person 4, and Person 5, and others known and unknown to the United States Attorney, to commit offenses against the United States, that is:

        a.        to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring individuals to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare;

        b.        to violate Title 42, United States Code, Section 1320a-7b(b)(1)(B), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole or in party by a Federal health care program, that is Medicare;

        c.        to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A), by knowingly and willfully offering and paying any remuneration, specifically, kickbacks and bribes,

directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare; and

      d.    to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B), by knowingly and willfully offering and paying any remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole or in party by a Federal health care program, that is Medicare.

### Purpose of the Conspiracy

49.    The purpose of the conspiracy was for defendant RAVITEJ REDDY, Person 3, Person 4, and Person 5 to unlawfully enrich themselves by: (a) soliciting, receiving, offering, and paying kickbacks and bribes in connection with the recruitment and referral of Medicare beneficiaries to MHS; (b) soliciting, receiving, offering, and paying kickbacks and bribes in connection with the acquisition, via telehealth referrals, of CGx- and PGx-testing prescriptions for Medicare beneficiaries; (c) submitting and causing the submission of claims to Medicare for CGx and PGx tests, the vast majority of which were performed by a MHS-contracted reference laboratory; (d) concealing the kickbacks and bribes; and (e) diverting proceeds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

### Manner and Means

50.    It was a manner and means of the conspiracy that defendant RAVITEJ REDDY, Person 4, and Person 5 agreed to acquire CGx and PGx samples and submit them for billing

through MHS, in part as a means to increase their respective share of profits compared to the conspiracy alleged in Count One of this Information.

51.     It was a further manner and means of the conspiracy that defendant RAVITEJ REDDY, Person 4, and Person 5 agreed to track the acquisition and billing of CGx and PGx samples by MHS using an informal alter-ego name for Company 3, in part as a method to more easily differentiate such samples from those acquired as part of the conspiracy alleged in Count One of this Information.

52.     It was a further manner and means of the conspiracy that Person 4 and Person 5 (through Company 3) obtained access to Medicare beneficiaries by targeting them with telemarketing campaigns and inducing them to submit CGx and PGx specimens by means of cheek swabs sent to the Medicare beneficiaries' homes.

53.     It was a further manner and means of the conspiracy that defendant RAVITEJ REDDY, Person 4, and Person 5 offered and paid kickbacks and bribes to Person 3 in order to obtain prescriptions for CGx and PGx tests from the telemedicine physicians contracted by Company 2, despite the fact that those doctors did not conduct a proper telemedicine visit, were not treating the Medicare beneficiaries for cancer or symptoms of cancer, did not use the test results in the treatment of the beneficiaries, and generally were not qualified to understand and interpret the test results.

54.     It was a further manner and means of the conspiracy that defendant RAVITEJ REDDY offered and paid kickbacks and bribes to Person 4 and Person 5 in exchange for causing Medicare beneficiaries to submit CGx and PGx samples, as well as certain Medicare-required documents, to MHS in support of MHS's subsequent claims to Medicare.

55.     It was a further manner and means of the conspiracy that defendant RAVITEJ REDDY, Person 4, and Person 5 attempted to establish a purported flat-fee payment arrangement to disguise the kickbacks and bribes.

56.     It was a further manner and means of the conspiracy that defendant RAVITEJ REDDY, Person 3, Person 4, and Person 5 took advantage of MHS's physical location within the coverage area of the Novitas MAC, which offered the highest reimbursement rates in the United States.   Indeed, defendant RAVITEJ REDDY and his co-conspirators used MHS as the billing ICL despite the fact that MHS did not possess properly validated equipment to conduct any CGx testing on-site and, as such, was forced to send samples to a reference laboratory located outside of the Novitas MAC coverage area.

57.     It was a further manner and means of the conspiracy that defendant RAVITEJ REDDY caused MHS to submit claims to Medicare under MHS's NPI number, through a third-party billing entity, for CGx and PGx testing in amounts regularly exceeding $12,000 per beneficiary.

58.     It was a further manner and means of the conspiracy that Person 4 and Person 5 paid kickbacks to Person 3 in connection with the telemedicine physicians' authorizations for CGx and PGx testing.

**Overt Acts**

59.     In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Western District of Pennsylvania, at least one of the following overt acts, among others:

    a.      On or about January 4, 2019, defendant RAVITEJ REDDY caused a funds transfer in the amount of $121,355.14 from MHS's S&T Bank account #XXXXXX0992 to a Bank United, NA account controlled by Person 4 and Person 5 and associated with Company 3.

    b.      On or about January 11, 2019, defendant RAVITEJ REDDY caused a funds transfer in the amount of $100,000.00 from MHS's S&T Bank account #XXXXXX0992 to a Bank United, NA account controlled by Person 4 and Person 5 and associated with Company 3.

    c.      On or about January 11, 2019, defendant RAVITEJ REDDY caused a funds transfer in the amount of $50,000.00 from MHS's S&T Bank account #XXXXXX0992 to a Bank United, NA account controlled by Person 4 and Person 5 and associated with Company 3.

    d.      On or about January 22, 2019, defendant RAVITEJ REDDY caused a funds transfer in the amount of $140,293.18 from MHS's S&T Bank account #XXXXXX0992 to a Bank United, NA account controlled by Person 4 and Person 5 and associated with Company 3.

    e.      On or about January 25, 2019, defendant RAVITEJ REDDY caused a funds transfer in the amount of $300,000.00 from MHS's S&T Bank account #XXXXXX0992 to a Bank United, NA account controlled by Person 4 and Person 5 and associated with Company 3.

    f.      On or about January 29, 2019, defendant RAVITEJ REDDY caused a funds transfer in the amount of $292,127.49 from MHS's S&T Bank account #XXXXXX0992 to a Chase Bank, NA account controlled by Person 4 and Person 5 and associated with Company 3.

    g.      On or about February 1, 2019, defendant RAVITEJ REDDY caused a funds transfer in the amount of $302,313.25 from MHS's S&T Bank account #XXXXXX0992 to a Chase Bank, NA account controlled by Person 4 and Person 5 and associated with Company 3.

h.      On or about February 19, 2019, defendant RAVITEJ REDDY caused a funds transfer in the amount of $100,000.00 from MHS's S&T Bank account #XXXXXX0992 to a Chase Bank, NA account controlled by Person 4 and Person 5 and associated with Company 3.

i.      Between in and around May 2018 and on or about April 12, 2019, defendant RAVITEJ REDDY caused MHS to submit Medicare Part B claims for CGx and PGx testing on behalf of approximately 3,343 beneficiaries, totaling approximately $45,273,653.82.   As a result, MHS received reimbursements of approximately $23,411,613.44, including millions of dollars in reimbursements for CGx and PGx testing performed on samples obtained through Person 4 and Person 5's marketing activities.   Reimbursements were deposited into bank accounts controlled by defendant RAVITEJ REDDY and located in the Western District of Pennsylvania.

All in violation of Title 18, United States Code, Section 371.

## COUNT THREE

The United States Attorney further charges that:

60.    Paragraphs 1 through 30 of this Information are re-alleged and incorporated by reference as though fully set forth herein.

### The Conspiracy and Its Objects

61.    From in and around October 2018, through on or about April 12, 2019, in the Western District of Pennsylvania, and elsewhere, the defendant, RAVITEJ REDDY, did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with Person 6, and others known and unknown to the United States Attorney, to commit offenses against the United States, that is:

a.    to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring individuals to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare; and

b.    to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A), by knowingly and willfully offering and paying any remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare.

**Purpose of the Conspiracy**

62.     The purpose of the conspiracy was for defendant RAVITEJ REDDY and Person 6 to unlawfully enrich themselves by: (a) soliciting, receiving, offering, and paying kickbacks and bribes in connection with the recruitment and referral of Medicare beneficiaries to MHS; (b) soliciting, receiving, offering, and paying kickbacks and bribes in connection with the acquisition, via telehealth referrals, of CGx- and PGx-testing prescriptions for Medicare beneficiaries; (c) submitting and causing the submission of claims to Medicare for CGx and PGx tests, the vast majority of which were performed by a MHS-contracted reference laboratory; (d) concealing the kickbacks and bribes; and (e) diverting proceeds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

**Manner and Means**

63.     It was a manner and means of the conspiracy that defendant RAVITEJ REDDY and Person 6 agreed to acquire CGx and PGx samples and submit them for billing through MHS, in part as a means to increase their respective share of profits compared to the conspiracy alleged in Count One of this Information.

64.     It was a further manner and means of the conspiracy that Person 6 used Company 5 in connection with the acquisition and billing of CGx and PGx samples by MHS.

65.     It was a further manner and means of the conspiracy that Person 6 obtained access to Medicare beneficiaries by targeting them with telemarketing campaigns and inducing them to submit CGx and PGx specimens by various means.

66.     It was a further manner and means of the conspiracy that defendant RAVITEJ REDDY offered and paid kickbacks and bribes to Person 6 in exchange for causing Medicare

beneficiaries to submit CGx and PGx samples, as well as certain Medicare-required documents, to MHS in support of MHS's subsequent claims to Medicare.

67.     It was a further manner and means of the conspiracy that defendant RAVITEJ REDDY and Person 6 attempted to establish a purported flat-fee payment arrangement to disguise the kickbacks and bribes.

68.     It was a further manner and means of the conspiracy that defendant RAVITEJ REDDY and Person 6 took advantage of MHS's physical location within the coverage area of the Novitas MAC, which offered the highest reimbursement rates in the United States.   Indeed, defendant RAVITEJ REDDY and his co-conspirators used MHS as the billing ICL despite the fact that MHS did not possess the necessary equipment to conduct any CGx testing on-site and, as such, was forced to send samples to a reference laboratory located outside of the Novitas MAC coverage area.

69.     It was a further manner and means of the conspiracy that defendant RAVITEJ REDDY caused MHS to submit claims to Medicare under MHS's NPI number, through a third-party billing entity, for CGx and PGx testing in amounts regularly exceeding $12,000 per beneficiary.

### Overt Acts

70.     In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Western District of Pennsylvania, at least one of the following overt acts, among others:

a.     On or about February 1, 2019, defendant RAVITEJ REDDY caused a funds transfer in the amount of $922,647.16 from MHS's S&T Bank account #XXXXXX0992 to a Wells Fargo Bank, NA account controlled by Person 6 and associated with Company 5.

b.      On or about February 25, 2019, defendant RAVITEJ REDDY caused a funds transfer in the amount of $1,358,500.00 from MHS's S&T Bank account #XXXXXX0992 to a Wells Fargo Bank, NA account controlled by Person 6 and associated with Company 5.

c.      On or about February 27, 2019, defendant RAVITEJ REDDY caused a funds transfer in the amount of $1,541,500.00 from MHS's S&T Bank account #XXXXXX0992 to a Wells Fargo Bank, NA account controlled by Person 6 and associated with Company 5.

d.      Between in and around May 2018 and on or about April 12, 2019, defendant RAVITEJ REDDY caused MHS to submit Medicare Part B claims for CGx and PGx testing on behalf of approximately 3,343 beneficiaries, totaling approximately $45,273,653.82.   As a result, MHS received reimbursements of approximately $23,411,613.44, including millions of dollars in reimbursements for CGx and PGx testing performed on samples obtained through Person 6's marketing activities.   Reimbursements were deposited into bank accounts controlled by defendant RAVITEJ REDDY and located in the Western District of Pennsylvania.

All in violation of Title 18, United States Code, Section 371.

## COUNT FOUR

The United States Attorney further charges that:

71.     Paragraphs 1 through 10, 12, and 15 through 19 of this Information are re-alleged and incorporated by reference as though fully set forth herein.

72.     At all relevant times, Person 7 and Person 8 operated Company 6, a marketing entity located in Pittsburgh, Pennsylvania, that obtained specimens from Medicare beneficiaries for subsequent submission to ICLs for testing.    Company 6 obtained PGx specimens, as well as samples for other types of testing, including gastrointestinal testing (GI), respiratory pathogen testing (RPP), and urinary tract infection testing (UTI).

73.     Between in and around October 2017 and in and around April 2019, in the Western District of Pennsylvania, and elsewhere, the defendant, RAVITEJ REDDY, did knowingly and willfully offer and pay any remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by a Federal health care program; that is, defendant RAVITEJ REDDY paid Person 7 and Person 8, through Company 6, percentage-based kickbacks and bribes, via bank accounts fund transfers, to induce Person 7 and Person 8 to refer hundreds of Medicare beneficiaries to PGL for PGx, GI, RPP, and UTI testing, resulting in hundreds of thousands of dollars in Medicare Part B reimbursements paid to PGL.

In violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A).

## FORFEITURE ALLEGATIONS

74.     The allegations of this Information are re-alleged and by this reference fully incorporated herein for purposes of alleging criminal forfeiture

75.     The United States hereby gives notice to the defendant charged in Counts One through Four of this Information that, upon his conviction of such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(7), which requires any person convicted of such offenses to forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses, including but not limited to, the following:

    a.     A sum of money in an amount to be determined by the Court.

76.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a.     cannot be located upon the exercise of due diligence;

    b.     has been transferred, sold to, or deposited with a third party;

    c.     has been placed beyond the jurisdiction of the Court;

    d.     has been substantially diminished in value; or

    e.     has been commingled with other property which cannot be subdivided without difficulty,

28

the United States intends to seek forfeiture pursuant to Title 21, United States Code, Section

853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), of any other property

of the defendant up to the value of the forfeitable property described in these forfeiture allegations.


SCOTT W. BRADY
United States Attorney
PA ID No. 88352